THE HONORABLE JOHN C. COUGHENOUR

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

JERMAINE E. SATTERWHITE,

10

Plaintiff,

11

v.

12

MARIA LUISA DY, M.D.; MANUELL
LACIST; DENISE DUBLE, FNP; JOHN
AND JANE DOES 1-10 and UNITED
STATES OF AMERICA,

13
14
15

Defendants.

CASE NO. C11-0528-JCC

ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY
JUDGMENT

16
17
18
19
20
21
22
23
24
25
26

   Plaintiff Jermaine Satterwhite claims that Defendant Manuell Lacist, a physician's assistant at the federal detention center where Satterwhite was incarcerated, violated Satterwhite's Eighth Amendment rights by failing to prescribe treatment for, recommend Satterwhite for treatment for, or otherwise respond to Satterwhite's latent tuberculosis infection. (Dkt. No. 16.) Currently before the Court are (1) Lacist's motion for summary judgment on the ground of qualified immunity (Dkt. No. 76) and (2) Satterwhite's motion for a continuance of the Court's decision on Lacist's motion (Dkt. No. 80). Having thoroughly considered the parties' briefing and the record, the Court finds oral argument unnecessary and hereby DENIES Lacist's motion for summary judgment (Dkt. No. 76) and DENIES Satterwhite's motion for a continuance (Dkt. No. 80) as moot, for the reasons explained herein.

I.      **BACKGROUND**

The following comes from Satterwhite's first amended complaint and three documents Lacist asserts were in effect at the time of the alleged constitutional violation: the U.S. Bureau of Prison's Program Statements on Infectious Disease Management and Patient Care, and its Clinical Practice Guidelines for the Management of Tuberculosis ("Tuberculosis Guidelines"). (Dkt. No. 77 Exs. A, E, D.) Lacist submitted these documents with his motion for summary judgment and attests that he was "ordered to follow and adhere to" them when he was employed at the Federal Detention Center in Seatac, Washington ("FDC-Seatac"). (Dkt. No. 77 ¶¶ 7, 11, 13.) Because Lacist has moved for summary judgment, the Court interprets these documents, and draws all reasonable inferences from them, in the light most favorable to Satterwhite. *See Blair Foods, Inc. v. Ranchers Cotton Oil*, 610 F.2d 665, 668 (9th Cir. 1980).

A.      **Tuberculosis and the Bureau's Program Statements and Guidelines**

Tuberculosis is caused by infection with *M. tuberculosis*. (Dkt. No. 77 Ex. D at 51.) *M. tuberculosis* is transmitted through airborne respiratory droplets when an individual with active pulmonary tuberculosis coughs, sneezes, or speaks. (*Id.*) An individual who is infected with the organism but who has not developed active tuberculosis is deemed to have latent tuberculosis infection ("LTBI"). (*Id.*) Approximately 7–10% of infected persons who are not treated for LTBI develop active tuberculosis disease at some point in their lives. (*Id.*) Active tuberculosis is a serious, potentially life-threatening disease. *See McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997) ("highly contagious and deadly disease"); *Lauria v. Donahue*, 438 F. Supp. 2d 131, 135 (E.D.N.Y. 2006) ("the deadly disease"); *Stewart v. Taft*, 235 F. Supp. 2d 763, 765 n.1 (N.D. Ohio 2002) ("communicable and potentially deadly disease").

At the time of the alleged constitutional violation, the Bureau's Tuberculosis Guidelines and Infectious Disease Management Program Statement provided that the Bureau would screen each inmate for tuberculosis within two calendar days of initial incarceration using the Tuberculin Skin Test ("TST"), also known as the purified protein derivative ("PPD") test. (Dkt.

No. 77 Exs. A at 14, D at 53.) "The test is 'read' by measuring in millimeters (mm) the largest diameter of the indurated area (palpable swelling) on the forearm." (*Id.* Ex. D at 54.) An induration of 5 millimeters or greater was considered "TST-positive." (*Id.* at 55.) The Guidelines provided that all TST-positive inmates should be referred for a chest X-ray to rule out active tuberculosis disease. (*Id.*)

The Infectious Disease Management Program Statement provided that "[i]nmates will be evaluated and treated for latent TB infection or TB disease in accordance with guidance from the Medical Director" and that "[f]ollow-up periodic chest x-rays for inmates with previously positive tuberculin skin tests will be conducted based upon guidance from the Medical Director." (*Id.* Ex. A at 15–16; *see also id.* at 31 ("Once an institution physician determines a TB exposure has occurred, the exposed individuals will be offered evaluation and treatment for latent TB in accordance with the U.S. Public Health Service recommendations and guidance from the Medical Director.").) The Guidelines, which had been "updated to reflect recently issued guidance from Centers for Disease Control and Prevention (CDC) on TB control in correctional facilities," in turn provided that "all" "inmates who have a positive TST" of "10 millimeters or greater" "should be evaluated for LTBI treatment," and "[t]reatment of LTBI should be considered for all TST positive inmates regardless of age, when no medical contraindications to treatment exist, and previous adequate treatment has not been provided." (*Id.* Ex. D at 47, 55, 57; *see id.* at 51 ("Identification of latent TB infection provides an opportunity for providing treatment to prevent future development of TB disease."); *id.* at 53 ("[P]roviding treatment for those with latent TB infection [is an] important public health measure[].").) An exception to the rule of considering all TST-positive inmates with an induration of 10 millimeters or greater for LTBI treatment was that "[i]nmates in detention centers should ordinarily not be prescribed LTBI treatment if their anticipated incarceration is uncertain or is less than several months, unless [certain] . . . high priority indications have been identified . . . ." (*Id.* at 58.) Finally, certain individuals—such as "converters," whose TST reading had increased by 10 millimeters

1    or more in a two-year period and thus were at a higher risk of developing active tuberculosis—

2    were "high priority candidates for LTBI treatment." (*Id.* at 57.)

3         According to the Guidelines, there were two "standard options for treatment of LTBI."

4    (*Id.*) The "preferred regimen" was six to nine months of isoniazid by mouth along with

5    pyridoxine: "**Nine months of isoniazid should be administered . . . , whenever feasible, for all**

6    **. . . inmates.**" (*Id.* at 58 (emphasis in original).) The Guidelines provided that "[g]roup

7    counseling or other structured educational efforts should be considered for inmates who refuse

8    treatment for LTBI when treatment is clearly indicated" and that "[i]nmates who refuse treatment

9    of LTBI should sign a refusal form to be kept in their medical record, documenting their

10   declination of treatment." (*Id.* at 60, 62.)

11        The Guidelines also included a section on "TB contact investigations," which the prison

12   was to carry out when it identified "a potentially infectious TB case" with whom others might

13   have come into contact: "The goal of a TB contact investigation is both to identify other active

14   cases of TB (rare) and *to identify and completely treat individuals with new latent TB infection*,

15   particularly those at high risk for developing the disease." (*Id.* at 69 (emphasis added).) The

16   Guidelines provided that "[f]ocus should be placed on identifying the highest risk contacts [*i.e.*,

17   those with the greatest duration or concentration of exposure], completely screening them *and*

18   providing a full course of treatment of LTBI for those who are infected." (*Id.* (emphasis in

19   original).) Under "Infection Control Measures," the Guidelines provided, "Inmates should be

20   advised of the importance of completing treatment for either TB disease or LTBI if diagnosed."

21   (*Id.* at 75.) Finally, under "TB Program Management," the Guidelines provided that "[p]articular

22   attention should be focused on ensuring," *inter alia*, that "[i]nmates are treated for LTBI in

23   accordance with recommended guidelines." (*Id.* at 78.)

24        The Bureau's Program Statement on Patient Care provided that each prison would

25   provide ambulatory care services through primary care provider teams ("PCPT"). (*Id.* Ex. E at

26   113.) Under the PCPT model:

ORDER DENYING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT
PAGE - 4

[E]ach inmate is assigned to a medical team of health care providers and support staff who are responsible for managing the inmate's health care needs.

. . . . .

[M]id-level providers (MLP) need to be available to provide diagnostic and treatment services to the inmate population . . . . [E]ach MLP [is] assigned a caseload of [a certain number of] inmates.

. . . . .

A physician will provide clinical oversight for multiple provider teams. The physician, as the licensed provider of the team, is responsible for the care that team delivers.

. . . . .

[T]he MLP is the PCPT's primary care provider . . . . The MLP will serve as the primary point of contact for inmates assigned to their caseload.

(*Id.* at 113–15.)

The Program Statement on Patient Care also provided:

**SOAP Format**. Patient encounters will be documented using the SOAP format:
- **S**—Subjective or Symptomatic data
  **O**—Objective Data
  **A**—Assessment
  **P**—Plan

**Patient education** is a required element of the treatment plan. Education may be documented under "P," or may be documented separately ("**SOAPE**").

(*Id.* at 120.)

## B.    Alleged Eighth Amendment Violation

Satterwhite was incarcerated at FDC-Seatac from approximately March 27, 2008 to April 21, 2009. (Dkt. No. 16 ¶ 3.1.) The TST that prison staff administered to Satterwhite upon his incarceration revealed an 18-millimeter induration. (*Id.* ¶ 3.3.) His chest X-ray was negative for active tuberculosis disease. (*Id.* ¶¶ 3.5–3.6.) On April 8, 2008, Defendant Manuell Lacist, a physician's assistant and "mid-level provider" at FDC-Seatac, performed a "History & Physical" exam of Satterwhite. (*Id.* ¶ 3.8; Dkt. No. 77 Exs. B–C.) Under "Tuberculosis," Lacist recorded that Satterwhite had a "Positive" "PPD Result" within the last year and that his chest X-ray was normal. (Dkt. No. 77 Ex. B at 33.) Lacist admits in his motion for summary judgment that he

knew from this information that Satterwhite had LTBI. (Dkt. No. 76 at 9; Dkt. No. 82 at 1.) In the History & Physical report, under "Potential Items For Follow-up," Lacist wrote, "PPD Administration Not Performed."[1] (Dkt. No. 77 Ex. B at 42.) Lacist recorded the following in Satterwhite's chronological record of medical care:

```
S/O    FOR H[ISTORY] & P[HYSICAL] SEE BEMR [MEDICAL RECORD]
A      P[HYSICAL] E[XAM], H[ISTORY] O[F] +[POSITIVE] PPD
P/E    [SICK CALL] COPAY EXPLAINED
       R[ETURN] T[O] C[LINIC] P[RO] R[E] N[ATA] [AS NEEDED]
```

(*Id.* Ex. C at 44.) Lacist did not discuss LTBI treatment with Satterwhite, did not refer him to a physician to be considered for treatment, and did not record anything under "plan" or "Potential Items For Follow-up" regarding treatment or follow-up monitoring. (*Id.* Exs. B, C.) Nothing in the record indicates that Satterwhite was contraindicated for LTBI treatment. (*Id.*)

Defendant Maria Luisa Dy, M.D. was the physician assigned to Satterwhite. (Dkt. No. 16 ¶ 3.10.) She co-signed the History & Physical report and chronological record of medical care that Lacist prepared. (Dkt. No. 77 Exs. B at 42, C at 44.)

On January 27, 2009—almost ten months after Lacist examined Satterwhite—Satterwhite submitted a request for treatment for a productive cough he had had for at least a month. (Dkt. No. 16 ¶ 3.11.) Kendall Hirano, another physician's assistant at FDC-Seatac, examined Satterwhite, did not order a chest X-ray or prescribe any tuberculosis treatment, and diagnosed Satterwhite with "cough secondary to post-nasal drainage/allergic rhinitis." (*Id.* ¶¶ 3.12–3.13.) Dr. Dy co-signed the exam and evaluation. (*Id.* ¶ 3.14.) On March 16, 2009, Hirano saw Satterwhite again and documented that he was suffering from chest pain and the same productive cough. (*Id.* ¶ 3.15.) Hirano diagnosed Satterwhite with "other anomalies of the ribs and sternum," and Dr. Dy again co-signed the exam and evaluation. (*Id.* ¶¶ 3.16–3.17.)

---

[1] Because neither party addresses this "Follow-up" section of the report, and because it is unclear to the Court what Lacist meant to convey when he wrote, "PPD Administration Not Performed," the Court does not consider this item of the record further.

On April 21, 2009, Satterwhite was transferred to the federal correctional facility in Herlong, California. (*Id.* ¶ 3.19.) On May 3, 2009, he was transferred to St. Mary's Medical Center in Reno, Nevada, where the hospital discovered a lesion in his right lung, enlarged lymph nodes, lytic bone lesions, a compression fracture of one of Satterwhite's vertebra caused by an epidural mass compressing the spinal cord, and a lesion in the first lumbar vertebra—all found to have been caused by untreated, widespread tuberculosis. (*Id.* ¶ 3.22.) Satterwhite underwent two spinal surgeries and currently suffers from a permanent disabling injury to his spinal cord, including paralysis and loss of sensation in both legs. (*Id.* ¶¶ 3.23, 3.25–3.26.)

Satterwhite brought a *Bivens* action for damages against Lacist, Dr. Dy, Hirano,[2] and a nurse at FTC-Seatac for allegedly violating his Eighth Amendment right to be free from cruel and unusual punishment. (*Id.* § IV.) *See Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971). Satterwhite alleges that Lacist violated his Eighth Amendment rights "by willfully and purposefully and with deliberate indifference failing to respond to and treat Plaintiff Satterwhite's known serious medical condition of latent TB," including by "failing to prescribe any anti-TB treatment, refer Plaintiff for evaluation and treatment by a physician[,] or inform Plaintiff or any other health care providers at FDC SeaTac that Plaintiff had a positive skin test of 18 millimeters." (*Id.* ¶¶ 4.2, 4.6.) Lacist now moves for summary judgment on the basis of qualified immunity.

## II.   DISCUSSION

### A.   Legal Standards

#### 1.   Summary Judgment

Summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). Where the

---

[2] Satterwhite and Hirano subsequently stipulated to Hirano's dismissal with prejudice on the basis that Hirano, as a U.S. Public Health Service officer, was absolutely immune from suit. (Dkt. No. 45.)

ORDER DENYING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT
PAGE - 7

1  party opposing a motion for summary judgment will have the burden of proof on an issue at trial,

2  the moving party can prevail by "pointing out to the district court . . . that there is an absence of

3  evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325

4  (1986). Once the moving party meets this initial burden, the opposing party must then "set forth

5  specific facts showing that there is a genuine issue for trial" in order to defeat the motion.

6  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quotation marks omitted); Fed. R.

7  Civ. P. 56(e). In deciding a motion for summary judgment, a court draws all inferences in the

8  light most favorable to the party opposing the motion. *Blair Foods*, 610 F.2d at 668.

9  **2.  Eighth Amendment**

10  "The [Eighth] Amendment . . . requires that inmates be furnished with the basic human

11  needs, one of which is 'reasonable safety,'" *Helling v. McKinney*, 509 U.S. 25, 33 (1993)

12  (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989)), and

13  prison officials "must 'take reasonable measures to guarantee [such] safety.'" *Farmer v.*

14  *Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)).

15  "Having incarcerated [individuals], having stripped them of virtually every means of self-

16  protection and foreclosed their access to outside aid, the government and its officials are not free

17  to let the state of nature take its course." *Farmer*, 511 U.S. at 833; *see DeShaney*, 489 U.S. at

18  199–200. Specifically with respect to physical health:

19
20   [D]enial of medical care may result in pain and suffering which no one suggests
     would serve any penological purpose. The infliction of such unnecessary
21   suffering is inconsistent with contemporary standards of decency . . . . [I]t is but
     just that the public be required to care for the prisoner, who cannot by reason of
22   the deprivation of his liberty, care for himself.

23  *Estelle v. Gamble*, 429 U.S. 97, 103–104 (1976) (quotation marks, citations, and indications of

24  alteration omitted). "To establish an Eighth Amendment violation, a plaintiff must satisfy both

25  an objective standard—that the deprivation was serious enough to constitute cruel and unusual

26  punishment—and a subjective standard—deliberate indifference." *Snow v. McDaniel*, 681 F.3d

ORDER DENYING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT
PAGE - 8

978, 985 (9th Cir. 2012).

a.       **Objective Prong**

The plaintiff must show an objectively serious deprivation. Exposure to an unreasonably high risk of harm satisfies this prong: In "situations in which exposure to toxic or similar substances [such as infection] would present a risk of sufficient likelihood or magnitude—and in which there is a sufficiently broad consensus that exposure of *anyone* to the substance should therefore be prevented—[]the Amendment's protection [is] available even though the effects of exposure might not be manifested for some time." *Helling*, 509 U.S. at 34. "[D]etermining whether [such] conditions of confinement violate the Eighth Amendment requires [(1)] a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to [the harmful toxin or infection]" and (2) an "assess[ment] [of] whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk"—*i.e.*, whether "the risk of which he complains is not one that today's society chooses to tolerate." *Id.* at 36. In the context of a medical provider's treating a prisoner for a complained-of malady or risk of disease, the question is whether "a reasonable doctor or patient would find [the complained-of harm or risk of harm] important and worthy of comment or treatment." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled in part on other grounds*, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997)).

For example, in *Helling*, the plaintiff alleged that he was assigned to a cell with another inmate who smoked five packs of cigarettes a day, that he had suffered health problems caused by exposure to environmental tobacco smoke ("ETS"), and that the defendants' failure to regulate or ban ETS jeopardized his health in violation of the Eighth Amendment. 509 U.S. at 28. The court of appeals held that "it would be cruel and unusual punishment to house a prisoner in an environment exposing him to levels of ETS that pose an unreasonable risk of harming his health," *id.* at 30, observing that "society's attitude had evolved to the point that involuntary

ORDER DENYING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT
PAGE - 9

1  exposure to unreasonably dangerous levels of ETS violated current standards of decency," *id.* at

2  29. The Supreme Court affirmed, holding that the plaintiff "had stated an Eighth Amendment

3  claim on which relief could be granted by alleging that his compelled exposure to ETS poses an

4  unreasonable risk to his health." *Id.* at 31.

5       "The [*Helling*] Court analogized the case before it with hypothetical situations in which

6  prison officials were deliberately indifferent to other types of potential harms, such as 'exposure

7  of inmates to a serious, communicable disease.'" *Johnson v. Epps*, 479 F. App'x 583, 591 (5th

8  Cir. 2012) (unpublished) (quoting *Helling*, 509 U.S. at 35). For example, in *Hutto v. Finney*, 437

9  U.S. 678 (1978), the Supreme Court observed that crowding prisoners into cells, where "some

10 prisoners suffer[] from infectious diseases such as hepatitis and venereal disease," *id.* at 682, is a

11 "prison condition[] for which the Eighth Amendment require[s] a remedy, even [if] it [i]s not

12 alleged that the likely harm [will] occur immediately and even though the possible infection

13 might not affect all of those exposed," *Helling*, 509 U.S. at 33. In *Gates v. Collier*, 501 F.2d

14 1291 (5th Cir. 1974), the court affirmed the district court's holding that allowing "[s]ome

15 inmates with serious contagious diseases . . . to mingle with the general prison population,"

16 alongside maintaining a host of other unsanitary and inhumane conditions, "constitute[d] cruel

17 and unusual punishment." *Id.* at 1300–03 (cited with approval in *Rhodes v. Chapman*, 452 U.S.

18 337, 352 n.17 (1981), and *Helling*, 509 U.S. at 34). In *Powers v. Snyder*, 484 F.3d 929 (7th Cir.

19 2007), the court observed that "knowingly exposing a prisoner to hepatitis or other serious

20 diseases could [] amount to cruel and unusual punishment in violation of the federal

21 Constitution." *Id.* at 931 (citing *Barnes v. Briley*, 420 F.3d 673, 675 (7th Cir. 2005); *Forbes v.

22 Edgar*, 112 F.3d 262, 267 (7th Cir. 1997); *Billman v. Ind. Dep't of Corrs.*, 56 F.3d 785, 788–89

23 (7th Cir. 1995); *Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006)). In *Glick v. Henderson*,

24 855 F.2d 536 (8th Cir. 1988), the court observed that a plaintiff would "have a colorable [Eighth

25 Amendment] claim . . . if he could show that there is 'a pervasive risk of harm to inmates' of

26 contracting the AIDS virus and if there is 'a failure of prison officials to reasonably respond to

ORDER DENYING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT
PAGE - 10

that risk.'" *Id.* at 539–40 (quoting *Martin v. White*, 742 F.2d 469, 474 (8th Cir.1984)). In *Powell v. Lennon*, 914 F.2d 1459 (11th Cir. 1990), the court held that the plaintiff's allegations that "the defendants forced him to remain in a dormitory [whose] atmosphere was filled with friable asbestos" and that "defendants knew of the health danger and yet refused to move the plaintiff to an asbestos-free environment" stated a claim for "deliberate indifference to the plaintiff's serious medical needs." *Id.* at 1463. And in *DeGidio v. Pung*, 920 F.2d 525 (8th Cir. 1990), the court held that the prison staff's "serious and persistent instances of negligent and substandard efforts to remedy the tuberculosis epidemic . . . evidenced deliberate indifference to the inmates' serious medical needs." *Id.* at 531, 533 (quotation marks omitted); *see Castillo v. Solano Cty. Jail*, No. 2:08–cv–3080 GEB KJN P, 2011 WL 3584318, at *13 (E.D. Cal. Aug. 12, 2011) ("It is well accepted that . . . 'substantial risks of harm' include 'exposure of inmates to a serious, communicable disease . . . .'") (quoting *Helling*, 509 U.S. at 33).

### b.  Subjective Prong

The plaintiff must also show that his prison doctor was "deliberately indifferent" to his serious medical needs, which the courts equate with "subjective recklessness." *Estelle*, 429 U.S. at 104; *Snow*, 681 F.3d at 985. "[T]he [deliberate indifference] standard is 'less stringent in cases involving a prisoner's medical needs [than in cases involving disciplinary actions] because the State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns.'" *Snow*, 681 F.3d at 985 (quoting *McGuckin*, 974 F.2d at 1060) (quotation marks and indications of alteration omitted). "To show deliberate indifference, the plaintiff 'must show that the course of treatment the doctors chose was medically unacceptable under the circumstances' and that the defendants 'chose this course in conscious disregard of an excessive risk to plaintiff's health.'" *Id.* at 988 (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)); *see Farmer*, 511 U.S. at 847–48 ("[A] prison official may be held [deliberately indifferent] only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."); *Wilhelm v. Rotman*, 680

F.3d 1113, 1122 (9th Cir. 2012). Thus, if the measures available to "abate" the risk are "feasible, [are] readily implemented, and in fact significantly reduce a substantial risk of severe [harm]," and the official "refuses to adopt such an alternative in the face of these documented advantages, without a legitimate [] justification for [such refusal], then [that] refusal . . . can be viewed as 'cruel and unusual' under the Eighth Amendment." *Baze v. Rees*, 553 U.S. 35, 52 (2008).

Accidents, negligence, "ordinary lack of due care," mere "*inadvertent* failure to provide adequate medical care," decisions on matters of medical judgment, and mere medical malpractice do not constitute deliberate indifference. *Whitley v. Albers*, 475 U.S. 312, 319 (1986); *Estelle*, 429 U.S. at 105–08. But a showing of deliberate indifference requires "something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. For example, being aware of but "ignor[ing] a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year" can constitute deliberate indifference. *Helling*, 509 U.S. at 33; *see Hunt v. Dental Dep't*, 865 F.2d 198, 201 (9th Cir. 1989) ("Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment."). "In deciding whether there has been deliberate indifference to an inmate's serious medical needs, [the court] need not defer to the judgment of prison doctors or administrators." *Hunt*, 865 F.2d at 200.

Finally, a court "may infer the existence of [deliberate indifference] from the fact that the risk of harm is obvious." *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) (citing *Farmer*, 511 U.S. at 842); *cf., e.g.*, *McGuckin*, 974 F.2d at 1060 ("[T]he fact that an individual sat idly by as another human being was seriously injured despite the defendant's ability to prevent the injury is a strong indicium of callousness and deliberate indifference to the prisoner's suffering.").

### 3.    Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known." *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244 (2012) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (citation omitted) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982)); *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1050 (9th Cir. 2002) ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.") (quotation marks and indications of alteration omitted).

Lacist argues that the qualified immunity inquiry here is whether Satterwhite had "a [clearly established] constitutional right to latent tuberculosis medications." (Dkt. No. 76 at 14.) That frames the inquiry too narrowly. For a right to be clearly established, the very action in question need not have previously been held unlawful. *Creighton*, 483 U.S. at 640; *Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir. 2011) (en banc) ("officials can still be on notice that their conduct violates established law even in novel factual circumstances") (quoting *Hope*, 536 U.S. at 741); *see, e.g.*, *Jackson*, 90 F.3d at 331–32 ("The doctors contend that they are entitled to qualified immunity because there was no clearly established law requiring them to provide a kidney transplant to a prisoner on dialysis. The doctors state the issue too narrowly."). Instead, the question is whether "it would [] have been clear to a reasonable [physician's assistant] knowing what [Lacist] knew (viewed in the light most favorable to [Satterwhite]) that [doing nothing in the face of Satterwhite's LTBI], posed such a substantial risk of serious harm that [it] would be constitutionally impermissible." *Ramirez-Palmer*, 301 F.3d at 1053.

## B.    Preliminary Matters

The Court must first clear up some misconstructions of the record appearing in the briefing. First, Lacist states, "The BOP Clinical Practice Guidelines for Management of

ORDER DENYING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT
PAGE - 13

1    Tuberculosis that are applicable to inmates in a detention facility, such as FDC-Seatac, provide

2    that the inmate 'should ordinarily <u>not</u> be prescribed [latent tuberculosis infection] treatment if

3    their anticipated incarceration is uncertain or is less than several months'" and "[a]ccordingly,

4    Lacist was not authorized to recommend treatment for Satterwhite's latent tuberculosis, and

5    consistent with Lacist's understanding of BOP policy, Lacist would not have presumed that

6    Satterwhite would need to be referred for treatment in April 2008." (Dkt. No. 76 at 4–5

7    (alterations in original).) There is no evidence in the record that Satterwhite's anticipated

8    incarceration was uncertain or less than several months. Thus, this section of the Bureau's

9    Tuberculosis Guidelines does not stand for the proposition that Lacist was not authorized to

10   recommend that Satterwhite be treated for LTBI, and it does not support rejecting a presumption

11   that Satterwhite should be treated.

12         Second, Satterwhite misstates the definition of a "recent converter" as a person "who had

13   a recent tuberculin skin test (TST) measuring 10 mm or more in a 2 year period" and then asserts

14   that he fit this definition and was therefore a high priority for LTBI treatment. (Dkt. No. 78 at 6.)

15   That is not the definition of "recent converter." A "recent converter" is an individual whose TST

16   induration has *increased* by 10 millimeters or more in a two year period. (Dkt. No. 77 Ex. D at

17   55.) There is no evidence in the record of a prior TST result for Satterwhite against which to

18   measure his 2008 induration of 18 millimeters—and thus no evidence supporting his assertion

19   that he was a "recent converter."

20         Finally, Lacist asserts in his declaration:

21       In all my years as a mid-level practitioner with the BOP, I have never been in
22       charge of prescribing Latent TB or TB treatment to any resident. As part of my
         duties, I am involved with continuing the treatment process once it has started. At
23       FDC-Seatac, the decision to treat latent TB is made by the Medical Director [Dr.
24       Dy] in coordination with the Infectious Disease Coordinator.

25   (Dkt. No. 77 ¶ 8; *see* Dkt. No. 76 at 2 ("nor was Lacist authorized to prescribe such treatment"),

26   9 ("[A]s far as Lacist's [sic] knew, . . . the decision to treat or not treat Satterwhite's latent

ORDER DENYING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT
PAGE - 14

1    tuberculosis was not his decision to make.") (citing Dkt. No. 77 ¶ 8, Exs. A, E).) The Court must

2    address what Lacist's assertion, read in conjunction with the Guidelines and Program Statements,

3    does and does not tend to show. Lacist's assertion does not create a genuine dispute of fact as to

4    whether he was authorized to, or responsible for, evaluating Satterwhite for LTBI treatment,

5    recommending an LTBI treatment or monitoring plan to Dr. Dy, or recommending that Dr. Dy

6    consider such a plan. Indeed, the Program Statement on Patient Care provided that Lacist, as the

7    mid-level provider assigned to Satterwhite, was Satterwhite's "primary care provider" and

8    "primary point of contact" and was responsible for "provid[ing] diagnostic and treatment

9    services" to Satterwhite. (Dkt. No. 77 Ex. E at 115, 113.) Moreover, the Program Statement

10   required Lacist to document every patient encounter using the "SOAP" format, where "P" stands

11   for "plan." (*Id.* at 120.) And the Guidelines provided that "all" "inmates who have a positive

12   TST" of "10 millimeters or greater" "should be evaluated for LTBI treatment" where no

13   contraindications are present. (*Id.* Ex. D at 55, 57.) The reasonable inference from this evidence

14   that is most favorable to Satterwhite (which the Court must draw) is that Lacist, having been

15   assigned to perform Satterwhite's History & Physical, was the person designated to "evaluate[]"

16   Satterwhite for LTBI treatment, and to recommend an appropriate "plan" for the treatment or

17   monitoring of Satterwhite's LTBI—or at least to recommend that Dr. Dy consider such a plan.

18       Lacist points the Court to the section of the Bureau's Infectious Disease Management

19   Program Statement that says, "Follow-up periodic chest x-rays for inmates with previously

20   positive tuberculin skin tests will be conducted based upon guidance from the Medical Director."

21   (*Id.* Ex. A at 16.) "As such," he argues, "a reasonable person, such as Lacist, could understand

22   that even if Satterwhite was not prescribed latent tuberculosis [treatment] at the time of the

23   physical, he would not be at an excessive risk of harm given the continual monitoring required

24   under the Guidelines." (Dkt. No. 82 at 10; *see* Dkt. No. 76 at 17.) The problem for Lacist is that

25   the other evidence in the record suggests that the "guidance from the Medical Director" on

26   follow-up periodic chest X-rays for a TST-positive individual like Satterwhite was that his

ORDER DENYING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT
PAGE - 15

1   primary care provider team would develop a "plan" for treating his LTBI or periodically

2   monitoring his infection with chest X-rays. Indeed, in the almost ten months between when

3   Lacist examined Satterwhite and when Satterwhite requested a medical appointment for a severe

4   cough, not a single follow-up X-ray was performed on Satterwhite. This evidence suggests that

5   follow-up X-rays would *not* occur automatically, that Satterwhite's primary care provider team

6   (including Lacist) was responsible for scheduling such follow-ups, and that Lacist was aware of

7   these circumstances. The Court, interpreting the evidence in the light most favorable to

8   Satterwhite, infers that the "guidance from the Medical Director" on conducting "[f]ollow-up

9   periodic chest x-rays for inmates with previously positive tuberculin skin tests" was that such

10  inmates' primary care provider teams were responsible for implementing a "plan" for conducting

11  such follow-up monitoring, and that Lacist could not have counted on their automatic occurrence

12  in the absence of treatment.

13        **C.    Analysis**

14        Genuine issues of material fact preclude a grant of summary judgment for Lacist on the

15  ground of qualified immunity at this stage of the proceedings.

16               **1.    Eighth Amendment**

17        As discussed *supra*, it is well-established that knowingly confining a prisoner in a small

18  space for a prolonged period of time with other prisoners who are infected with serious,

19  contagious diseases (including, for example, tuberculosis), when there is not a sufficiently

20  compelling penological reason for doing so, exposes the prisoner to an unreasonably high risk of

21  harm and constitutes an objectively serious deprivation for purposes of the Eighth Amendment.

22  *See, e.g.*, *Hutto*, 437 U.S. at 682; *Forbes*, 112 F.3d at 266; *Jeffries v. Block*, 940 F. Supp. 1509,

23  1514–15 (C.D. Cal. 1996) ("[t]here is no doubt" that exposure to tuberculosis-infected inmates

24  presents a "serious health risk" and a "substantial risk of serious harm"). Here, the failure to treat

25  Satterwhite's LTBI exposed him to a greater risk of harm than such hypothetical conditions of

26  confinement would have: In the latter case, he would have been exposed to the mere *risk* of

ORDER DENYING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT
PAGE - 16

1  being infected with *M. tuberculosis—i.e.*, of *developing* LTBI; in the case at bar, not treating

2  Satterwhite's LTBI made his continued latent infection a *certainty*.

3        Moreover, the Bureau's Tuberculosis Guidelines and Infectious Disease Management

4  Program Statement demonstrate that "there [wa]s a sufficiently broad consensus [at the time] that

5  exposure of *anyone* [in Satterwhite's position] to the [risk of progressing from LTBI to active

6  tuberculosis] should . . . be prevented" by treating his LTBI infection or, at a minimum,

7  monitoring him for development of active tuberculosis. *Helling*, 509 U.S. at 34. Those

8  Guidelines and Program Statement emphasized (1) testing every inmate upon initial

9  incarceration, (2) considering every LTBI-positive, non-contraindicated prisoner for treatment,

10 (3) monitoring latent and active cases, (4) "offer[ing] evaluation and treatment for latent TB in

11 accordance with the U.S. Public Health Service recommendations and guidance from the

12 Medical Director" to all inmates exposed to a "TB exposure" incident in the prison (Dkt. No. 77

13 Ex. A at 31), (5) "identify[ing] and *completely treat[ing]* individuals with new latent TB

14 infection" resulting from contact with an infectious TB case (*Id.* Ex. D at 69, 71–72 (emphasis

15 added)), (6) advising prisoners on "the importance of completing treatment for . . . LTBI if

16 diagnosed" (*Id.* at 75), (7) counseling and educating prisoners who refused LTBI treatment and

17 documenting incidents of such refusal, (8) "ensuring" that "[i]nmates [we]re treated for LTBI in

18 accordance with recommended guidelines" (*Id.* at 78), and (9) adhering to "standard" treatment

19 regimens for LTBI. These documents evince a societal consensus that the treatment of LTBI in

20 prisons should be an opt-out scheme: A prisoner with LTBI would be treated unless there was an

21 affirmative reason not to. In other words, "society's attitude had evolved to the point that

22 involuntary exposure to [the risk of progressing from LTBI to active tuberculosis disease]

23 violated current standards of decency." *Helling*, 509 U.S. at 29. The objective prong of the

24 Eighth Amendment test is met here.

25       That Satterwhite was not a "high priority" candidate for LTBI—for example, that he was

26 not a "recent converter"—does not show that his untreated, unmonitored infection did not

1    present a substantial risk of serious harm. Nor does the fact that "only" approximately 5% of

2    infected persons develop active tuberculosis during the first year or two after infection (Dkt. No.

3    77 Ex. D at 51). Lacist cites to no case—and this Court can find none—standing for the

4    proposition that a 5% risk of developing a serious, potentially life-threatening disease is, as a

5    matter of law, not an objectively serious risk of harm. To the contrary, as discussed, it is well-

6    established that knowingly exposing a prisoner to a substantially high *risk* of infection with a

7    serious disease like tuberculosis is an objectively serious harm. Doing nothing to monitor or

8    reverse a *certain* infection of the same serious disease, when the means of doing so are readily

9    available to the medical provider—when in fact there is a "standard" treatment to reverse such an

10   infection—creates no less serious a risk for the inmate. The Court finds support (albeit non-

11   precedential) for this conclusion in *Tai Huynh v. Hubbard*, 471 F. App'x 591 (9th Cir. 2012)

12   (unpublished disposition). In *Tai Huynh*, the plaintiff "allege[d] that after he tested positive for

13   [latent] tuberculosis, defendants refused to administer a preventative tuberculosis treatment in a

14   proper manner, and, as a result, he is now at a high risk of developing active tuberculosis and

15   multi-drug resistant tuberculosis." *Id.* at 591. The Ninth Circuit reversed the district court's

16   dismissal of the plaintiff's complaint: "[W]e cannot say that these allegations fail to state an

17   Eighth Amendment injury." *Id.* (citing *Helling*, 509 U.S. at 32–35).

18        Construing the evidence in the light most favorable to Satterwhite, the subjective prong

19   of the Eighth Amendment inquiry is also met: Measures available to "abate" Satterwhite's risk of

20   developing active tuberculosis—namely, treating his LTBI, or closely monitoring him—were

21   "feasible, [were] readily implemented, and in fact [would have] significantly reduce[d]" the

22   likelihood of Satterwhite's developing active tuberculosis and associated complications, and

23   Lacist "refuse[d] to adopt [those] alternative[s] in the face of these documented advantages,

24   without a legitimate penological justification for [such refusal]." *Baze*, 553 U.S. at 52. Moreover,

25   the Court infers that Lacist was aware that LTBI posed a substantially serious risk of harm to

26   Satterwhite from the obviousness of that risk—as evidenced by the multitude of cases that had

already recognized that mere exposure to the substantial risk of developing LTBI was an objectively serious harm, and by the gravity with which the Bureau's Program Statement and Tuberculosis Guidelines treated tuberculosis. *See Hope*, 536 U.S. at 738. Though Lacist attests that "[a]t no time did I consider Mr. Satterwhite's positive PPD test to constitute an obvious and severe risk to his health" (Dkt. No. 77 ¶ 10), the obviousness of the risk permits an inference to the contrary and creates a genuine issue of fact as to Lacist's state of mind.

This case is distinguishable from those in which medical staff merely accidentally or negligently failed to properly diagnose or treat a prisoner. Lacist does not argue that he accidentally misdiagnosed Satterwhite; to the contrary, he admits he knew Satterwhite had LTBI. (Dkt. No. 77 ¶ 10.) Lacist does not argue that he knew he should have considered Satterwhite for treatment or scheduled Satterwhite for follow-up X-rays, but accidentally or negligently forgot to do so. He argues instead that he was fully apprised of the guidance in the Tuberculosis Guidelines and Program Statement on treating and monitoring LTBI (that he was in fact ordered to adhere to this guidance), that he was fully aware of Lacist's diagnosis, and that knowing what he knew, he affirmatively chose not to evaluate Satterwhite for, or recommend, treatment or monitoring. If Lacist was indeed responsible or authorized to make such recommendations (a fact still in dispute), then his failure to do so was not mere negligence; it was deliberate indifference to a serious medical need.

This case is also distinguishable from those involving a matter of medical judgment or a difference of opinion as to the appropriate diagnostic procedure or treatment course. The Tuberculosis Guidelines and Program Statements show that it would have been "medically unacceptable under the circumstances" to do nothing for Satterwhite—to refuse to consider him for treatment or treat him, and to schedule no follow-up X-rays to monitor his condition. *Snow*, 681 F.3d at 988. In other words, choosing to do nothing for Satterwhite would not have been a valid exercise of medical judgment. *Cf. McGowan v. Hulick*, 612 F.3d 636, 641 (7th Cir. 2010) (medical professional's actions may reflect deliberate indifference if he "chooses an easier and

1   less efficacious treatment [let alone no treatment or monitoring at all] without exercising

2   professional judgment") (quotation marks omitted).

3          For these reasons, the cases to which Lacist cites for support do not help him. In *Martinez

4   v. Boyd*, No. 08–cv–02181–PAB–MEH, 2009 WL 2766771 (D. Colo. Aug. 27, 2009), the

5   plaintiff disagreed with the doctors' use of X-ray as their diagnostic tool, with their conclusion

6   that the X-rays showed no sign of tuberculosis, and with their resulting decision to cease

7   treatment of the plaintiff for tuberculosis but continue to monitor him monthly. *Id.* at *5. That

8   was a mere "difference of opinion" between the plaintiff and the doctors as to his diagnosis and

9   proper care. *Id.* at *6–7. In *Palladino v. Wackenhut Corrections*, No. CIV.A. 97–CV–2401, 1998

10  WL 855489 (E.D. Pa. Dec. 10, 1998), the doctors made a medical judgment not to treat the

11  plaintiff for LTBI "because of his age and his foot condition." *Id.* at *1. And *Marcotte v. Monroe

12  Corrections Complex*, 394 F. Supp. 2d 1289 (W.D. Wash. 2005), concerned a "mere

13  disagreement over the reasonableness of [the defendant's] diagnosis, treatment, and follow-

14  up . . . ." *Id.* at 1296. "Although an inmate is not entitled to demand specific care and is not

15  entitled to the best care possible, he is entitled to reasonable measures to meet a substantial risk

16  of serious harm." *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011). Doing nothing was not

17  "reasonable" here.

18         *Shaver v. CFG Healthcare*, No. 09–cv–3280 (NLH)(JS), 2011 WL 3882287 (D. N.J.

19  Sept. 2, 2011), is also inapposite. In that case, the plaintiff's TST "did not clearly demonstrate

20  latent TB." *Id.* at *4. Moreover, the defendant put on evidence that "for latent TB, no medical

21  treatment is necessary," and the plaintiff "cite[d] no authority to" the contrary. *Id.* Thus *Shaver*'s

22  outcome resulted from the plaintiff's failure to put on any evidence of a constitutional violation.

23         *Garcia v. Anderson*, No. 08–4731 (ADM/JJG), 2009 WL 2900304 (D. Minn. Sept. 2,

24  2009), is also distinguishable. In that case, the defendant medical professionals "took no further

25  affirmative action to evaluate transplantation as a treatment option" after a specialist determined

26  the plaintiff would be a transplant candidate. *Id.* at *2. The court found no Eighth Amendment

ORDER DENYING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT
PAGE - 20

1  violation, however, because in lieu of a transplant, the defendants "routinely performed"

2  "laboratory tests and ultrasounds" and otherwise monitored the plaintiff to ensure that his

3  condition "remained stable and relatively unchanged." *Id.* Here, as discussed, in lieu of treatment

4  (or recommending treatment), Lacist did (or recommended doing) nothing. *Cf. Burks v.*

5  *Raemisch,* 555 F.3d 592, 594 (7th Cir. 2009) ("A prisoner's statement that . . . medical personnel

6  [were alerted] to a serious medical condition, that they did nothing in response, and that

7  permanent injury ensued, is enough to state a claim on which relief may be granted—if it names

8  the persons responsible for the problem.").

9  <h3>2.    Clearly Established Violation</h3>

10  Assuming that Lacist had the responsibility or authority to recommend treating or

11  monitoring Satterwhite's LTBI—which the Court infers he did—the question is whether a

12  reasonable physician's assistant in Lacist's shoes would have been aware that not recommending

13  treatment or scheduling follow-up monitoring "posed such a substantial risk of serious harm that

14  [such inaction] would be constitutionally impermissible." *Ramirez-Palmer*, 301 F.3d at 1053. A

15  reasonable physician's assistant would have been so aware. As discussed *supra*, it has long been

16  established that deliberate indifference to conditions that expose prisoners to an unreasonable

17  risk of contracting serious communicable diseases (including tuberculosis) violates the Eighth

18  Amendment. And as the Court already explained, if unreasonably exposing an inmate to the

19  substantial *risk* of being infected with *M. tuberculosis* is a clearly established violation of the

20  Eighth Amendment, then doing nothing to reverse or at least monitor an inmate's *certain*

21  infection—when the means of doing so are known to the defendant and at his disposal—is also a

22  violation of clearly established law. *See, e.g.*, *Powell*, 914 F.2d at 1464 (denying defendants

23  qualified immunity because the unlawfulness of defendants' refusal to place plaintiff in an

24  asbestos-free environment, after plaintiff informed them that "exposure to friable asbestos

25  threatened his life and health," "[c]ertainly . . . should have been apparent to the defendants in

26  light of *Estelle*"); *Epps*, 479 F. App'x at 592 ("Here, Johnson has alleged that the policies and

1    practices that Epps implemented for the prison barbershop exposed Johnson to [] serious,

2    communicable diseases and that Epps was aware of this risk and did nothing to eliminate that

3    risk. In light of *Helling*, a reasonable official would understand that operating the barbershop in

4    this fashion would violate Johnson's rights. As a result, Epps is not entitled to qualified

5    immunity."). A reasonable physician's assistant, with the authority and responsibility the Court

6    must infer Lacist had, would have known that doing nothing in the face of Lacist's LTBI "posed

7    such a substantial risk of serious harm that [it] would be constitutionally impermissible."

8    *Ramirez-Palmer*, 301 F.3d at 1053.

9    **III.    CONCLUSION**

10          For the foregoing reasons, the Court DENIES Lacist's motion for summary judgment

11   (Dkt. No. 76) and DENIES Satterwhite's motion for a continuance (Dkt. No. 80) as moot.

12          DATED this 23rd day of January 2013.

13

14

15

16

17

18                                              John C. Coughenour
                                                UNITED STATES DISTRICT JUDGE
19

20

21

22

23

24

25

26

ORDER DENYING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT
PAGE - 22